| | | |
|---|---|---|
| **NOLA BOURBON, LLC** | * | **NO. 2021-CA-0023** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **JORGE RODRIGUEZ-** | * | |
| **FRANCO AND LILLIAN** | | **FOURTH CIRCUIT** |
| **BENITEZ** | * | |
| | | **STATE OF LOUISIANA** |

**\* \* \* \* \* \* \***

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-07653, DIVISION "L"
Honorable Kern A. Reese, Judge
\* \* \* \* \* \*
**Judge Rosemary Ledet**
\* \* \* \* \* \*
(Court composed of Judge Roland L. Belsome, Judge Rosemary Ledet, Judge
Sandra Cabrina Jenkins)


Scott M. Galante
Salvador I. Bivalacqua
Lauren B. Griffin
GALANTE & BIVALACQUA LLC
650 Poydras Street, Suite 2615
New Orleans, LA 70130

    COUNSEL FOR PLAINTIFF/APPELLEE


Vincent J. Booth
BOOTH & BOOTH, APLC
138 North Cortez Street
New Orleans, LA 70119

    COUNSEL FOR DEFENDANT/APPELLANT

                **AFFIRMED**
                **June 23, 2021**

*RML*

*RLB*

*SCJ*

This is a property rights dispute between the owners of two adjoining

properties. The properties are located in the historic New Orleans French Quarter.

This dispute arises out of the use, access, and rights relating to an alleyway that

runs between the adjoining properties (the "Alley"). The plaintiff—Nola Bourbon,

LLC—owns the "Dominant Estate"; the defendant—Lillian Benitez[1]—owns the

---

[1]Ms. Benitez's husband, Jorge Rodriguez-Franco, also owns the Servient Estate and is a named defendant. For ease of discussion, we refer in this opinion to both Ms. Benitez and her husband

"Servient Estate." *See Morgan City Land v. Tennessee Gas Pipeline Co., L.L.C.*, 20-0676, pp. 10-11 (La. App. 4 Cir. 4/21/21), ___ So.3d ___, ___, 2021 WL 1570261, *6 (observing that "[t]he party that benefits from the predial servitude—here [Nola Bourbon]—is the dominant estate; and the party burdened by the servitude—here [Ms. Benitez]—is the servient estate"). This is the second appeal in this case. *Nola Bourbon, LLC v. Rodriguez-Franco*, 17-1002 (La. App. 4 Cir. 4/18/18), 243 So.3d 693 ("*Nola Bourbon I*").

In *Nola Bourbon I*, Ms. Benitez appealed the trial court's September 13, 2017 judgment issuing a permanent injunction against her and in Nola Bourbon's favor. Finding the case was tried on a petition for a preliminary injunction, this court reversed and remanded for a "full trial on the merits of the permanent injunction." 17-1002, p. 4, 243 So.3d at 696.[2] On remand, a second trial was held; and the trial court, on June 30, 2020, again issued a permanent injunction against

singularly as "Ms. Benitez." Although a separation of property agreement between Ms. Benitez and her husband was introduced at trial, we find it unnecessary for purposes of this appeal to address the effect, if any, of that agreement.

[2] Although she was the prevailing party in *Nola I*, Ms. Benitez filed a writ with the Louisiana Supreme Court seeking review of this court's decision to remand the case. The Supreme Court denied her writ. *Nola Bourbon, LLC v. Rodriguez-Franco*, 18-0817 (La. 8/3/18), 248 So.3d 1288.

Ms. Benitez and in NOLA Bourbon's favor. From that judgment, Ms. Benitez appeals. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Nola Bourbon owns the immovable property located at 933 Bourbon Street ("933 Bourbon"), which it acquired in 2011; Ms. Benitez owns the immovable property located at 927-31 Bourbon Street ("927-31 Bourbon"), which she acquired in 1995. As noted elsewhere in this opinion, this case arises out of a dispute over the Alley located between the adjoining properties. Nola Bourbon owns five to six inches of the Alley; Ms. Benitez owns three to four feet of the Alley.

At some time before 1900, the adjoining properties had mirror image, one-story structures built on them; the structures were built side-by-side on the Bourbon Street property line of each property. Each property had a full-sized— approximately three to four feet—alleyway. The alleyway on 927-31 Bourbon was on the right side; the alleyway on 933 Bourbon was on the left side. The alleyways were abutting.

Between 1908 and 1930, the structure located on 933 Bourbon was moved back from Bourbon Street, raised, and widened; approximately three to four feet

were added to the left side of the structure. As a result of the widening, all but five to six inches of the alleyway on the left side of 933 Bourbon was eliminated; thus, the access to the rear courtyard of 933 Bourbon was eliminated.

The rear courtyard of 933 Bourbon was enclosed by a three-sided brick wall; the structure on 933 Bourbon completed the square. The brick wall between 933 Bourbon and 927-31 Bourbon was built with a hole in it to allow access from the rear courtyard of 933 Bourbon into the Alley. Initially, there was a wooden door on the hole; subsequently, the wooden door was replaced with an iron gate. A French drain was built in the Alley to provide drainage for both 933 Bourbon and 927-31 Bourbon. At a much later date, an air condition compressor unit connected to the structure on 933 Bourbon was placed in the Alley.[3]

Until 2015, the property owners of 933 Bourbon accessed the Alley through the hole in the brick wall—through either the door or the gate—for three primary purposes: (i) to maintain the left side of their property; (ii) to maintain the French drain; and (iii) to maintain the Air-Conditioning Unit. Beginning in 2015, however, the owner of 927-31 Bourbon, Ms. Benitez, claimed the Alley exclusively

---

[3] Several air-conditioning compressors are located in the Alley. At least one of the air-conditioning compressors is connected to and services the structure on Nola Bourbon's property. For ease of discussion, we refer to the air-conditioning equipment that Nola Bourbon's ancestor in title installed in the Alley as the "Air-Conditioning Unit."

belonged to her, demanded the removal of the Air-Conditioning Unit, and bricked in the hole in the brick wall, blocking access to the Alley.[4] This suit ensued.

In August 2015, Nola Bourbon filed a Petition for Preliminary Injunction, Permanent Injunction, and *Ex Parte* Motion for Temporary Restraining Order. Simply stated, Nola Bourbon's petition sought rights in the Alley located partially on Ms. Benitez's property based on thirty-year acquisitive prescription pursuant to La. C.C. art. 740.[5] Ms. Benitez answered the petition; she argued that Nola Bourbon had no rights to the use of the Alley.

---

[4] The Alley is also accessible from a front gate on Bourbon Street. The crux of this dispute, however, is the access by the owners of 933 Bourbon to the Alley from the rear gate.

[5] In its petition, Nola Bourbon averred as follows:

- Petitioner and Defendants own adjacent houses. While the majority of the width of the alley in between the two properties is on Defendants' property, the alley has been used by Petitioner and the previous owners for more than 100 years, establishing a predial servitude and common alley between the parties. Access to this alley is the only way Petitioner can access and maintain the left side of [Petitioner's] property.

- Moreover, upon Petitioner's purchase of the property and relying on Louisiana Civil Code art. 740, Petitioner's air-conditioning compressors, or similar units, have been partially on Defendants' property in the same location peaceably and without interruption for more than 30 years, thus establishing a predial servitude by acquisitive prescription. Petitioner has had corporeal possession of these compressors through the continual use and has had the intent to possess this piece of property as owner. Moreover, the units are affixed to Petitioner's immovable property. Upon information and belief, there has been no interruption or extinguishment by nonuse.

5

Following two days of evidentiary hearings on the petition for injunctive relief,[6] the trial court rendered a judgment on September 13, 2017, along with written reasons for judgment. The trial court's judgment, as we observed in *Nola Bourbon I*, granted the following relief to Nola Bourbon:

- Ordered the prompt removal of the brick wall in the former passageway between the properties;

- Found the existence of a continuous[7] predial servitude of drainage;

- Found the existence of an apparent predial servitude of access for maintenance acquired by acquisitive prescription;

---

- As a precaution of Defendants tampering or destroying Petitioner's air conditioning units, on [July] 31, 2015, Petitioner, through undersigned counsel, contracted into a written and verbal agreement with Defendants, through Defendants' counsel, to refrain from taking any action for 10 days.

- During the course of the agreed upon 10 days, Defendants, or persons hired by Defendants, closed in Petitioner's back gate that leads into the common alley by erecting a brick wall. This illegal act caused and continues to cause significant permanent damage to Petitioner's property, such as Petitioner's inability to close [Petitioner's] back gate, the inability of water to drain into the French drain located in the common alley, and Petitioner is no[w] unable to move [Petitioner's] air conditioning compressors into Petitioner's backyard. Moreover, Defendant has literally BRICKED IN the passageway to the rear yard.

[6] In the interim between the filing of the petition and the granting of injunctive relief, the trial court issued various temporary restraining orders, including an order enjoining Ms. Benitez from dismantling or moving the Air-Conditioning Unit.

[7] The trial court's use of the term continuous was not a reference to the distinction between continuous and discontinuous servitudes suppressed in the 1977 revision of the Civil Code. Rather, the term continuous was used to refer to the fact that the servitude had been in continuous, uninterrupted use by 933 Bourbon, the Dominant Estate.

6

- Found the existence of a right of access and a servitude for maintenance and repairs to plaintiff's property; and

- Found the existence of a servitude in favor of plaintiff for the placement of air conditioning units in the common alley on defendants' property.

17-1002, pp. 3-4, 243 So.3d at 695. For ease of discussion, we refer in this opinion to these predial servitudes—predial servitude of drainage, apparent predial servitude of access for maintenance and repairs, and servitude for the placement of the Air-Conditioning Unit—collectively as the "Predial Servitudes."

As noted earlier in this opinion, this court, in *Nola Bourbon I*, reversed the trial court's judgment and remanded for a trial on the merits of the permanent injunction. On remand, Nola Bourbon, in response to this court's statement in *Nola Bourbon I* that Nola Bourbon may not have properly sought the recognition of a servitude of drainage, filed a supplemental petition in which it requested that Ms. Benitez also be enjoined from blocking, removing, or otherwise obstructing the French drain in the Alley. *See Nola Bourbon I*, 17-1002, p. 3, n. 1, 243 So.3d at 695 (observing that "[t]he petition for injunction makes a reference to the fact that water cannot drain from [Nola Bourbon's] property into a French drain in the

'common' alleyway. However, [Nola Bourbon] did not seek the recognition of a servitude of drainage").[8]

Following the second trial, the trial court once again granted a permanent injunction against Ms. Benitez and in NOLA Bourbon's favor. The trial court's judgment, dated June 30, 2020, ordered that Ms. Benitez was permanently enjoined from the following:

- Improperly dismantling, tampering, and/or removing the air conditioning compressors located in the common alleyway;[9]

- Denying and/or restricting Nola Bourbon's access to the common alleyway;

---

[8] In her answer to the supplemental petition, Ms. Benitez asserted the following defense:

> [Nola Bourbon's] property at 933 Bourbon Street at one time had an alley way on the left side of its property, which allowed access to its back courtyard, and which would have allowed [Nola Bourbon] to maintain the side of its house. However, [Nola Bourbon's] ancestors in title moved their building to within .6 feet of the property line, thereby building over, and eliminating, the [Nola Bourbon's] alleyway, and isolating [Nola Bourbon's] rear courtyard. Thus, the enclosure of [Nola Bourbon's] rear courtyard was a voluntary action of [Nola Bourbon], which does not give rise to a right of passage pursuant to Civil Code Article 689.

[9] This court has defined a "common alley" as "a servitude of passage that encumbers a passageway on one piece of property in favor of neighboring property" and observed that the right of use of a common alley . . . gives the neighbor the right to pass over the alley for purposes of ingress to and egress from his property." *Wetzel v. Khan*, 00-1083, pp. 3-4 (La. App. 4 Cir. 9/19/01), 797 So.2d 122, 125 (citing *Whitney Nat. Bank of New Orleans v. Poydras Center Associates*, 487 So.2d 120 (La. App. 4th Cir.1986)). A common alley, as Ms. Benitez contends, is generally created by title. Here, however, we find that the trial court used the term "common alley" in a colloquial, not a legal, sense.

- Blocking and/or obstructing Nola Bourbon's rear gate in any way; and

- Blocking and/or obstructing drainage from Plaintiff's property into the common alleyway.[10]

This appeal followed.

## DISCUSSION

For purposes of our analysis, we divide Ms. Benitez's arguments on appeal into the following three categories: (i) standard of review; (ii) nonapparent predial servitude; and (iii) acquisitive prescription.[11] We separately address each category.

*Standard of Review*

---

[10] Although Nola Bourbon pled damage claims, the trial court's denial of the damage claims has not been appealed. Thus, those claims are not before us.

[11] Ms. Benitez assigns as error the following:

1. The trial court erred in finding that the alley on defendants' property is a "common alleyway," owned in party by plaintiff.

2. The trial court erred in its apparent finding that a right of passage existed through the wall between the servient and dominant estates, and that defendant has no right to bar plaintiff's agents and guests from entering its alleyway.

3. The trial court erred in finding that plaintiff's dominant estate has the right to drain water onto the servient estate.

4. The trial court erred in failing to grant the relief sought by defendants' reconventional demand.

In her reconventional demand, Ms. Benitez requested a judgment ordering Nola Bourbon to remove the Air-Conditioning Unit and to cease-and-desist from trespassing on her property.

Ms. Benitez contends that the trial court's judgment contains numerous legal errors, including the unsupported conclusion that there is a "common alleyway," and that the trial court's judgment is devoid of any factual findings. She, thus, contends that the applicable standard of review is the *de novo* standard. Nola Bourbon counters that "a trial court's decision on whether a party has possessed property sufficient to prove thirty year acquisitive prescription is a factual determination and cannot be reversed on appeal unless it is manifestly erroneous or clearly wrong." We agree.

Appellate courts review judgments relating to servitudes under the manifest error standard of review. *See St. John Baptist Church of Phoenix v. Thomas*, 08-0687, p. 7 (La. App. 4 Cir. 12/3/08), 1 So.3d 618, 623.[12] Indeed, all the issues Ms.

---

[12] Summarizing the manifest error standard, the Louisiana Supreme Court has observed:

> It is well-settled in our jurisprudence that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. However, where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness' story, the court of appeal may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination.

Benitez raises on appeal are factual issues governed by the manifest error standard. First, the classification of a predial servitude as apparent or nonapparent turns on the facts and circumstances of the particular case. *See Wagner v. Fairway Villas Condo. Associates, Inc.,* 01-0734, p. 7 (La. App. 3 Cir. 3/13/02), 813 So.2d 512, 517. Second, whether a party has possessed property for thirty years without interruption is a question of fact. *Rathborne v. Hale*, 95-1225, 95-1226, p. 7 (La. App. 4 Cir. 1/19/96), 667 So.2d 1197, 1201; *see also St. John Baptist Church of Phoenix*, 08-0687, p. 7, 1 So.3d at 623 (observing that "[a] trial court's decision on whether a party has possessed property sufficient to prove thirty year acquisitive prescription is a factual determination and cannot be reversed on appeal unless it is manifestly erroneous or clearly wrong"). Third, "[w]hat constitutes possession in any case depends on the nature of the property and is a question of fact, with each case depending upon its own facts." *Alford v. Jarrell*, 471 So.2d 970, 973 (La. App. 1st Cir. 1985); *Rathborne*, 95-1225, p. 5, 667 So.2d at 1200.

Contrary to Ms. Benitez's contention, the trial court here made factual determinations. The same trial court judge tried this case on two separate

---

*Zito v. Advanced Emergency Medical Services, Inc*., 11-2382, p. 4-5 (La. 5/8/12), 89 So.3d 372, 375 (internal citations omitted).

occasions. Following each trial, the trial court issued a judgment and written reasons for judgment. Although appeals are taken from the judgment and not the reasons for judgment, the Louisiana Supreme Court has instructed that appellate courts are "entitled to use those reasons to gain insight into the [trial] court's judgment." *Wooley v. Lucksinger*, 09-0571, p. 78 (La. 4/1/11), 61 So.3d 507, 572; *Mathes Brierre Architects v. Karlton/ISG Enterprises, LLC*, 19-0357, p. 14, n. 9 (La. App. 4 Cir. 12/3/20), 311 So.3d 532, 542, *writ denied*, 21-0029 (La. 3/16/21), 312 So.3d 1090. We find it appropriate to do so here.

In its September 13, 2017 reasons for judgment, issued after the first trial, the trial court explained its initial factual findings and observed that it granted injunctive relief based on Nola Bourbon's proving its entitlement to the Predial Servitudes.[13] In its June 30, 2020 reasons for judgment, issued after the second

---

[13] In its September 13, 2017 written reasons for judgment, the trial court observed that Nola Bourbon was entitled to the following:

1. Defendant's prompt removal of the bricking in of the long-existing gate/passageway between the Dominant Estate and the common alleyway;

2. The finding of the existence of a continuous predial servitude of drainage which runs along the common alleyway distinctly for the benefit of the Dominant Estate;

3. The finding of the existence of an apparent predial servitude of access for maintenance and passage to the common alleyway acquired by acquisitive prescription.

trial, the trial court observed that "[t]his matter has now been tried before this Court on two separate occasions" and that "[t]his court has not heard any additional or new testimony, nor has it admitted any new or additional evidence though would impact its initial findings." The trial court, thus, declared that its initial factual findings regarding the Predial Servitudes did not change after the second trial and reaffirmed its initial findings. In sum, contrary to Ms. Benitez's contention, the record reflects that this case involves factual findings regarding the Predial Servitudes; thus, the applicable standard of review here is manifest error.

*Nonapparent Predial Servitude*

Ms. Benitez contends that the right of passage (common alleyway) that Nola Bourbon seeks is a nonapparent predial servitude, which can only be established through a writing—either by destination of the owner or by title. *See* La. C.C. art. 939 (providing that "[n]onapparent servitudes may be acquired by title only, including a declaration of destination under Article 741"). She emphasizes that La.

---

4. The right of access and a servitude to the common alleyway for maintenance and repairs to the Dominant Estate as well as the continuous right of access for maintenance of the predial servitude of drainage in favor of the Dominant Estate; and

5. A servitude in favor of the Dominant Estate for the placement and existence of an air conditioning unit in the common alleyway as acquired by acquisitive prescription.

C.C. art. 705 confirms that servitudes of passage generally are established by title.[14] Regardless, she contends that the right of passage Nola Bourbon seeks is necessarily a nonapparent servitude because it cannot be perceived by any external signs. According to Ms. Benitez, there is "simply a hole in [the] wall, which does not equate to evidence of passage on [her] property." Nola Bourbon counters that there are multiple external signs of the right of passage and that the trial court correctly characterized it as an apparent predial servitude subject to acquisitive prescription.

A predial servitude is a charge on property, the servient estate, for the benefit of another, the dominant estate. La. C.C. art. 646. Predial servitudes are either apparent or nonapparent. La. C.C. art. 707. Summarizing this distinction, a commentator has observed:

> The classification of a particular servitude as apparent or nonapparent depends on facts and circumstances rather than on the nature of the servitude. Thus, a servitude of right of way may be

---

[14] La. C.C. art. 705 provides:

> The servitude of passage is the right for the benefit of the dominate estate whereby persons, animals, utilities, or vehicles are permitted to pass through the servient estate. Unless the title provides otherwise, the extent of the right and the mode of its exercise shall be suitable for the kind of traffic necessary for the reasonable use of the dominant estate.

apparent or nonapparent. If the right of way is exercised over an arid tract of land, without a trace, the servitude is nonapparent; if it is exercised on a paved road or a railway track, the servitude is apparent. . . . Certain kinds of servitudes are apparent almost by necessity. Such are the servitudes of view on common walls, of drip, of support, and servitudes for the maintenance of a levee. Other kinds of servitudes are nonapparent also by necessity. For example, such are the negative servitudes, the building restrictions in a subdivision, and the prohibitions of building on a neighboring estate.

The practical significance of the division of predial servitudes into apparent and nonapparent relates to the rules governing the creation of servitudes. Nonapparent servitudes may only be acquired by title; whereas, apparent servitudes may be acquired by title, by destination of the owner, or by acquisitive prescription.

4 LA. CIV. L. TREATISE, PREDIAL SERVITUDES § 1:13 (4th ed.) (internal footnotes omitted).

Ms. Benitez's contention that this case involves a nonapparent predial servitude, which is not subject to acquisitive prescription, is misplaced. Multiple external signs of use of the Alley by Nola Bourbon and the prior owners of 933 Bourbon were established at trial. Those external signs include the fully functioning gate (formerly door) in the rear brick wall that has allowed access into the Alley; the front gate on Bourbon Street that has allowed egress from the Alley; the fully functioning French drain that has provided drainage for both properties; and the Air-Conditioning Unit connected to the structure on 933 Bourbon. Nola

15

Bourbon further points out that the maintenance by the owners of 933 Bourbon of the left side of their property, the French drain, and the Alley constituted further external signs. Given the facts and circumstances of this case, we cannot conclude the trial court was manifestly erroneous in characterizing the right of passage (common alleyway) as an apparent predial servitude.

*Acquisitive Prescription*

Ms. Benitez's final argument is that, assuming this case involves an apparent predial servitude subject to acquisitive prescription, Nola Bourbon failed to meet its burden of proof. Her argument is two-pronged. First, she contends that Nola Bourbon failed to present sufficient direct evidence of possession. Second, she contends that, assuming Nola Bourbon established that prescription commenced to run, prescription was interrupted by the precarious possession of at least one of its ancestors in title. Nola Bourbon counters that the trial court correctly concluded it established its right to the Predial Servitudes.

The applicable law is found in the following articles of the Louisiana Civil Code:

16

- Article 740 provides that "[a]pparent servitudes may be acquired by title, by destination of the owner, or by acquisitive prescription." La. C.C. art. 740;[15]

- Article 742 provides that "[t]he laws governing acquisitive prescription of immovable property apply to apparent servitudes. An apparent servitude may be . . . acquired by uninterrupted possession for thirty years without title or good faith." La. C.C. art. 742;

- Article 3421 provides that "[t]he exercise of a real right, such as a servitude, with the intent to have it as one's own is quasi-possession. The rules governing possession apply by analogy to the quasi-possession of incorporeals." La. C.C. art. 3421;[16]

- Article 3424 provides that "[t]o acquire possession, one must intend to possess as owner and must take corporeal possession of the thing." La. C.C. art. 3424;

- Article 3476 provides that "[t]he possessor must have corporeal possession, or civil possession preceded by corporeal possession, to acquire a thing by prescription. The possession must be continuous, uninterrupted, peaceable, public, and unequivocal. La. C.C. art. 3476;

- Article 3437 provides that "[t]he exercise of possession over a thing with the permission of or on behalf of the owner or possessor is precarious possession. La. C.C. art. 3437;

- Article 3477 provides that "[a]cquisitive prescription does not run in favor of a precarious possessor or his universal successor." La. C.C. art. 649; and

---

[15] Here, it is undisputed that Nola Bourbon is not seeking to acquire the Predial Servitudes by title or destination of owner; rather, it is seeking to do so solely based on thirty-year acquisitive prescription.

[16] Article 649 provides that "[a] predial servitude is an incorporeal immovable." La. C.C. art. 649.

- Article 3442 provides that "[t]he possession of the transferor is tacked to that of the transferee if there has been no interruption of possession." La. C.C. art. 3442.

The party asserting acquisitive prescription—here, Nola Bourbon—has the burden of proving all the facts that are essential to support it. *Delacroix Corp. v. Perez*, 98-2447, pp. 3-4 (La. App. 4 Cir. 11/8/00), 794 So.2d 862, 865 (observing that "[t]he party alleging acquisitive prescription bears the burden of proving intent to possess as owner and that his possession has been continuous and uninterrupted, peaceable, public and unequivocal"). "The burden of proof of acquisitive prescription is by a preponderance of evidence; every presumption is in favor of the titleholder." *Id.*; *see also* La. C.C. art. 730 (providing that "[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate").

The gist of Ms. Benitez's first argument is that only direct—as opposed to circumstantial—evidence is sufficient to establish possession for acquisitive prescription purposes. Stated differently, she contends that Nola Bourbon was required to establish specifically "who" was adversely possessing her property; "what" those acts consisted of; and whether those acts were performed with the

18

intent to possess as owner. Applying these requirements here, she poses the following four questions:

1) How does a hole in the wall establish any of those crucial facts?

2) Who was it that supposedly went through the hole in the wall?

3) Why were they going through the hole in the wall? And,

4) [M]ost importantly, did the defendants, or their ancestor in title, Mr. Kevin Davlin, grant permission for these individuals to come onto their property through the hole in the wall?

The last question dovetails into her second argument, which is that if the entry through the hole in the wall was permissive, then it cannot support a claim of acquisitive prescription because it constitutes precarious possession.

Contrary to Ms. Benitez' argument, the jurisprudence has held that circumstantial evidence can be used to establish acquisitive prescription; stated otherwise, "'[t]he intent to possess as owner may be inferred from all the surrounding facts and circumstances.'" *Frith Farms DeSoto Par. Interest P'ship, L.L.P. v. Lee*, 53,116, p. 9 (La. App. 2 Cir. 11/20/19), 284 So.3d 1247, 1253 (quoting *Livingston v. Unopened Succession of Dixon*, 589 So.2d 598, 602 (La. App. 2d Cir. 1991)). Using the four questions posed by Ms. Benitez as a

framework for our analysis, we review the direct and circumstantial evidence presented at the trial.

The Hole in the Wall

Based on historic photographs and Sanborn Maps,[17] it was established at trial that between 1908 and 1930 the structure located on 933 Bourbon was moved to its current location. Erin Vogt, Certified Building Plan Examiner of the Vieux Carré Commission, testified that the original structure on 933 Bourbon was "a four bay condominium. It was very similar to the building at 927[-31Bourbon]."[18] Ms.

---

[17] Sanborn maps are defined by WIKIPEDIA as follows:

> **Sanborn maps** are detailed maps of U.S. cities and towns in the 19th and 20th centuries. Originally published by **The Sanborn Map Company** (Sanborn), the maps were created to allow fire insurance companies to assess their total liability in urbanized areas of the United States. Since they contain detailed information about properties and individual buildings in approximately 12,000 U.S. cities and towns, Sanborn maps are valuable for documenting changes in the built environment of American cities over many decades.

WIKIPEDIA *at* https:// https://en.wikipedia.org/wiki/Sanborn_Maps#cite_note-keister1993-1 (last visited May 17, 2021) (citing Keister, Kim (May–June 1993). "Charts of Change". Historic Preservation. 45 (3): 42-49 (observing that "[s]tated simply, the Sanborn maps survive as a guide to American urbanization that is unrivaled by other cartography and, for that matter, by few documentary resources of any kind") (emphasis in original).

[18] Ms. Vogt She testified that the Vieux Carré Commission relies upon Sanborn Maps to make determinations regarding the historic placements of structures on properties.

20

Vogt explained that a 1900 photograph of Jean Lafitte's Blacksmith Shop,[19] shows that 933 Bourbon "was at the property line at that point" and that the 1908 Sanborn Map reflects "it was still at that property line." She testified that photograph from Jean Lafitte's reflects "by the late 1930's that the [933 Bourbon structure] ha[d] been pulled back" and that "a fifth bay was added to the Dumaine [left] side of the building." Continuing, she explained that at the time of the 1940 Sanborn Map, which was the next Sanborn Map that was produced in the City of New Orleans, the structure on 933 Bourbon had been moved back from that property line. Ms. Vogt further testified that "[b]ecause the structure had been widened it took up more of that space," and "it eliminated the alley on the [left] side" of 933 Bourbon.

Ms. Vogt's testimony regarding the timing and nature of the modification of the structure on 933 Bourbon was corroborated by the testimony of John Williams, who was qualified at trial as an expert in the field of architecture.[20] Mr. Williams testified that 933 Bourbon "had space that they could get to the rear courtyard, but they filled in the alleyway." Mr. Williams further testified that the existing

---

[19] Jean Lafitte's is a bar and one of the oldest buildings in the French Quarter; it is located next to the properties at issue.

[20] Mr. Williams' familiarity with 933 Bourbon was based on work he did for one of the prior owners, Mr. Lifsey. Mr. Lifsey hired Mr. Williams in 2003 to evaluate the property for a project that was ultimately abandoned.

structure on 933 Bourbon was filled in as much as three or four feet on the left between 1908 and 1930. He testified that following that widening of the structure, which filled in the alleyway, there was "no access" to the rear courtyard of 933 Bourbon.

As noted elsewhere in this opinion, the rear courtyard of 933 Bourbon was enclosed by a three-sided brick wall with the structure on 933 Bourbon completing the square enclosure. In the rear brick wall located between 933 Bourbon and 937-41 Bourbon, a hole was constructed to allow access to the Alley. The hole in the wall became the only means by which the owners of 933 Bourbon could access and maintain the left side of their property once the structure on the property was moved.

Nola Bourbon's member-representative, Robert Bergeron, testified that based on the manner in which the hole in the wall was constructed, it was apparent that it "was built there purposely at the time of the installation of the wall so you'd have access." He explained that "[o]therwise you would have never had access to the [left] side of the property." He further explained that "in the course of [his] research what I found was that people had been using that [hole in the wall] for decades. And that was confirmed by . . . me using the property for three years, four

years, without any impediment," until 2015 when Ms. Benitez bricked in the hole. He emphasized that once Ms. Benitez bricked in the hole "[i]f there's an emergency that we have to get out of the back of the property, we no longer can get out of the back of the property."

The hole in the brick wall initially had a wooden door on it. Two of Nola Bourbon's witnesses testified at trial regarding the apparent age of the wooden door—Steven Locke, who owned 933 Bourbon from around 1990 until 2005; and Kevin Davlin, who owned 937-41 Bourbon from 1988 until he sold it to Ms. Benitez in 1995.[21]

According to Mr. Locke, he remembered that when he purchased 933 Bourbon there "was a wooden door. It opened from our courtyard into the alley. So the door opened out. And there was a hook on the door to close it from our side. So we could hook it and unhook it." Mr. Locke also remembered that the wooden door was an old door that was not newly installed, and "[j]udging by the condition of the bricks around [the gate] and the wood [in 1990], I mean it had been there for 25 years at least. I mean it must have always been there." In an email dated August 27, 2015, Stephen Locke wrote to Mr. Bergeron the following:

---

[21] Although Mr. Davlin testified that he did not sell it to Ms. Benitez until a later date, Ms. Benitez established her date of acquisition was in 1995.

"[t]he gate (door) between 933 [B]ourbon and Lillian [Benitez]'s property was there when we bought 933 [Bourbon] in 1990. I'm sure it had been there for many years." Similarly, Mr. Davlin testified that the wooden door, which was present when he purchased 937-41 Bourbon, was "very old," "not sturdy," "decrepit" and "ancient."

At some time later, the wooden door was replaced with an iron gate. James Conrad Lifsey, who testified by deposition, stated that when he owned 933 Bourbon from 2001 to 2005, there was a green gate on the hole in the wall. Although he never had any need to use the Alley or the gate to access it, Mr. Lifsey remembered seeing his gardener open the gate. He also acknowledged that when he owned the property, he had the structure painted and that his painters may have accessed the Alley in some manner.

Consistent with Mr. Lifsey's testimony, Mr. Bergeron testified that there was a gate on the hole in the wall when Nola Bourbon purchased the property in 2011 and that he had unfettered use of that gate to access the Alley until 2015. Mr. Bergeron also testified that the relative situation of the adjoining properties has remained the same for over one hundred years. The only exception, he noted, was

the Air-Conditioning Unit, which has been in the same spot since at least the 1980s.

The affidavit of Louis Hartman, a licensed surveyor, also confirmed that the gate in the rear brick wall of 933 Bourbon has been a longstanding entryway to the Alley. In sum, the direct and circumstantial evidence presented at trial established the use by the owners of 933 Bourbon of the hole in the wall—first a wooden door, then a gate—as a means to access the Alley for over thirty years.

<u>Who Went Through the Hole</u>

The question of who went through the hole is directed to Ms. Benitez's contention that Nola Bourbon was required to identify its ancestors in title through whom, by tacking, it established acquisitive prescription. Given that Nola Bourbon's suit was filed in August 2015, it was required to present evidence of possession dating back thirty years to August 1985. Since Nola Bourbon did not acquire the property until 2011, it was required to establish possession by tacking. Ms. Benitez points out that Nola Bourbon failed to present any evidence of possession by an ancestor in title before 1988 or 1990, when Stephen Locke acquired 933 Bourbon. Because of this lack of direct evidence of its ancestors in title's actual use of the Alley between 1985 and 1988 or 1990, Nola Bourbon,

according to Ms. Benitez, cannot prevail in its efforts to secure rights in the Alley.[22] We find this argument unpersuasive given the circumstantial evidence presented at trial.

Mr. Bergeron's testimony coupled with the evidence presented established that all prior owners of 933 Bourbon were required to use the Alley to access and maintain the left side of 933 Bourbon once the structure on the property was moved to its current location between 1908 and 1930. Indeed, as Mr. Bergeron testified, in the event of an emergency, using the hole to access the Alley was the only way to exit the rear courtyard.

The factual inference that all prior owners of 933 Bourbon used the Alley to access and to maintain the left side of their property is supported by the testimony of Mr. Bergeron, Mr. Locke, Mr. Lipsey, and Mr. Davlin. We cannot conclude the trial court was manifestly erroneous in making that factual inference.

Why They Went Through the Hole

---

[22] Actually, there are two gaps insofar as identifying ancestors in title of 933 Bourbon for the thirty-year period. First, as Ms. Benitez points out, there is no proof as to the owner of the property before Mr. Locke purchased it in 1988 or 1990. Second, there is another gap between Mr. Lifsey's ownership, which was from 2001 to 2005, and Nola Bourbon's ownership, which was from 2011 to at least the date of trial. The trial court indicated that the second gap was a "short period during which other, unavailable third parties owned the Dominant Estate [933 Bourbon]." Mr. Bergeron testified that Nola Bourbon purchased the property from Harry Vardo and his partner, Gary, in 2011.

26

In addition to using the hole to maintain the left side of their property, the owners of 933 Bourbon went through the hole for at least two other purposes—to maintain the French drain and to maintain the Air-Conditioning Unit. Three witnesses—Mr. Locke, Mr. Bergeron, and Mr. Davlin—testified that the French drain was present and functioning to provide drainage for the adjoining properties during the time they owned their respective properties. These three witness also testified that the owners of 933 Bourbon continually maintained the French drain.[23]

Mr. Bergeron testified that the French drain "has been there a significant period of time because there is no other place for water to drain." He explained that the storm water from the roof of the structure on 933 Bourbon funnels to the downspout on the left side of the structure where it then empties into the French drain. Mr. Bergeron further explained that he did not install the downspouts from the gutters; rather, he testified that "if you look at the age of the gutters, they have been there for probably 100 years, the dropped downspouts."

Based on Mr. Bergeron's testimony coupled with the other evidence presented at trial, it was established that the French drain provided continuous,

---

[23] These three witnesses also testified regarding the presence of the Air-Conditioning Unit in the Alley when they acquired their respective properties. For ease of discussion, we address the use of the Alley for the Air-Conditioning Unit under the next heading—Precarious Possession.

uninterrupted drainage for the benefit of 933 Bourbon for over thirty years. Given this evidence, we cannot conclude the trial court was manifestly erroneous in finding that a predial servitude of drainage was established through acquisitive prescription.

Precarious Possession

Ms. Benitez's final contention is that if the entry through the hole in the wall was permissive, then it cannot support a claim of acquisitive prescription because it would constitute precarious possession. According to Ms. Benitez, Nola Bourbon's reliance on the hole in the wall as evidence of a servitude of passage ignores the issue of permissive use. Ms. Benitez's permissive use—precarious possession—argument is premised on an analogy to the Louisiana Supreme Court's decision in *Boudreaux v. Cummings*, 14-1499 (La. 5/5/15), 167 So.3d 559.

Ms. Benitez cites the *Boudreaux* case for the proposition that "tacit permission can be presumed under the limited circumstances where 'indulgence' and acts of 'good neighborhood' are present." *Boudreaux*, 14-1499 at p. 7, 167 So.3d at 563. She emphasizes that, in *Boudreaux*, the Supreme Court held that the defendant's failure to object to the use of the passageway was merely a "neighborly act of tolerance" and that the plaintiff's use of the passageway could

28

not be "the foundation of adverse possession needed for the purposes of acquisitive prescription." *Id*.

Ms. Benitez contends that Mr. Lifsey's testimony establishes that he had her express, not tacit, permission for the placement of the Air-Conditioning Unit in the Alley and to access that Air-Conditioning Unit as needed. Moreover, she contends that, even absent her express permission, her failure to object to such uses of the Alley would have been "acts of good neighborhood" and "neighborly acts of tolerance" consistent with the *Boudreaux* decision. *Id.*

Nola Bourbon counters that this court should not allow Ms. Benitez's self-serving testimony about her permission circumvent acquisitive prescription. In support, it cites former Justice Knoll's dissent in *Boudreaux*, which observes that "allowing any property owner to avoid prescription by simply arguing that his opponent's use of the property was allowed in the spirit of neighborliness" would severely jeopardize the law of acquisitive prescription. *Boudreaux*, 14-1499, p. 6, 167 So.3d at 568 (Knoll, J., dissenting).

We find Ms. Benitez's reliance on the *Boudreaux* case misplaced. In that case, the Supreme Court stated that its holding was "strictly limited to the facts

before [it]." *Boudreaux*, 14-1499, p. 9, 167 So.3d 559, 564.[24] We, likewise, find it appropriate to resolve the issue based on the facts before us.

Ms. Benitez's theory of precarious possession is premised primarily on Mr. Lifsey deposition testimony, which was introduced at both trials. In his deposition, Mr. Lifsey testified that, shortly after he purchased 631 Bourbon, Ms. Benitez showed him the Air-Conditioning Unit in the Alley that was connected to the structure on his property. Ms. Benitez, in that conversation, informed him that she had given the prior owner of 933 Bourbon permission to place the Air-Conditioning Unit on her property and that Mr. Lifsey had her permission to leave it there. Mr. Lifsey testified that he had no other conversations with Ms. Benitez regarding the issue of the Air-Conditioning Unit, permission to use the Alley, or access to the Alley.

Addressing Mr. Lifsey's testimony, the trial court in its reasons for judgment issued after the first trial observed:

---

[24] *See Upchurch v. Randall Well Serv*., 45,056, p. 6 (La. App. 2 Cir. 4/14/10), 34 So.3d 500, 503 (observing that it was limiting its holding to the facts before it and not creating a "bright line rule"); *Haase v. Donaldson*, 407 So.2d 461, 463 (La. App. 1st Cir. 1981) (observing it was not announcing a general rule and "[t]hus, this decision is limited to the facts before us"); *see also Horaist v. Pratt,* 21-00166, p. 2 (La. 3/23/21), 312 So.3d 1093, 1095 (observing that the appellate court, which relied upon *Boudreaux,* "misconstrued the Pratts' discussion with their neighbor before the building of new fencing on the existing line as evidence of precarious possession").

> Mr. Lifsey testified repeatedly that, during his ownership, he, his agents, and the employees of said agents had unfettered access to the common alleyway, through the Gate, for maintenance and repair. Though Mr. Lifsey provided some testimony regarding the Air Conditioner, it was solely a notation that [Ms. Benitez] once told [Mr.] Lifsey the Air Conditioners were present "by permission." Besides this, Mr. Lifsey testified he had absolutely no other conversations with [Ms. Benitez] about any other access or permissions.

Mr. Lifsey's testimony, thus, was simply that Ms. Benitez told him that the Air-Conditioning Unit was in the Alley, which was her property, with her permission.

Other than Ms. Benitez telling Mr. Lipsey that she gave him permission to leave the Air-Conditioning Unit in the Alley, the record is devoid of evidence supporting a finding of precarious possession. Athough Ms. Benitez testified at the first trial,[25] the trial court found her testimony contradicted the testimony of her own witness, Mr. Lifsey, regarding his exercise of access rights, use of the Alley, and the existence of a gate on the rear wall when she purchased the property. The trial court also observed that Ms. Benitez "disavowed having any memory of the presence of Air Conditioner [Units] when she purchased the property in 1995."

---

[25] At the first trial, Ms. Benitez testified that she brought up with Mr. Lifsey the issue of the Air-Conditioning Unit. She testified that she gave him permission to leave it where it was located, but if it broke he was to move it. She testified that this was a verbal agreement. She further testified that Mr. Lifsey sold the property shortly before Hurricane Katrina, which was in 2005, but she continued to let the Air-Conditioning Unit stay out of courtesy. She did not discuss the issue with the new owners.

Ms. Benitez failed to appear at the second trial. Her husband and adult daughter appeared and testified in her place. Their testimony, however, was not helpful in resolving the property rights issue presented here.

Three other witnesses—Mr. Bergeron, Mr. Locke, and Mr. Davlin—testified that the use of the Alley did not require permission. Mr. Bergeron testified to his unfettered use of the Alley without the need for permission from the time Nola Bourbon purchased the property in 2011 until Ms. Benitez bricked in the wall in 2015. Mr. Locke similarly testified regarding his unfettered use of the Alley during the entire time he owned the property, including after Mr. Davlin sold the property to Ms. Benitez. Mr. Locke testified that he never asked for permission nor was permission ever needed to access the Alley because it "was like an extension of our property" or "[was like a] part of our house." Similarly, Mr. Davlin testified it was a "mutual alley way":

> I did my research on the property by going to the French Quarter Historical Society and getting the history of the property going all the way back to 1827. . . . I never knew if I owned it, if they owned, or if we owned it. I never—it was mutually shared. We stored our ladders in there and the air conditioners in there. And I think we threw trash cans in there every once in a while. But we both did. I never knew if I owned it or if they owned it or we both owned it. It's the way it was always explained to me from the realtor when I bought it. . . . I didn't have exclusive use of it.

Mr. Davlin also compared how he viewed the Alley with how he viewed his swimming pool on 937-41 Bourbon, observing:

> Well, yes, the swimming pool I owned. That was mine. And Steve [Locke and his partner,] Norton absolutely had permission to swim in it. But the alleyway, I didn't have the right to give them permission to use it. We both possessed it. And you know, there's a difference if I invite you over to go swimming it's because I own the swimming pool. I don't -- I didn't have the right to say you have permission to use to service [your] air conditioner or to store [your] ladder there. I didn't have to ask them for permission. They didn't ask me for permission. We both possessed the alleyway.

Given the testimony of these witnesses, we find Ms. Benitez's precarious possession argument unpersuasive. We further conclude that the trial court's finding Nola Bourbon met it burden of establishing its entitlement to the Predial Servitudes was not manifestly erroneous.

As to the servitude for the placement of the Air-Conditioning Unit, we further note that the record reflects that the Air-Conditioning Unit, or a similar unit, has been situated in the same location and affixed to the structure on 933 Bourbon since before Mr. Locke acquired the property in 1988 or 1990. In an email to Mr. Bergeron, Mr. Locke stated that "[t]he air conditioning units were also in place at the time of our purchase to the best of my recollection. We had

permission to put [air-conditioning] units from a previous owner, a man from Springfield, Illinois, Kevin [Davlin]."

Mr. Davlin testified that the Air-Conditioning Unit was present when he purchased 937-41 Bourbon. He explained that before Mr. Locke purchased 933 Bourbon, there was an air conditioning unit that serviced and was attached to the structure on 933 Bourbon that was located in the Alley. Mr. Davlin recalled that during Mr. Locke's remodeling of 933 Bourbon, Mr. Locke replaced the older air conditioning unit with a new unit.

Recapping, Mr. Davlin's testimony and the other evidence in the record supports a finding that the Air-Conditioning Unit, or a similar unit, has been in the same spot and affixed to the structure on 933 Bourbon for more than thirty years. Accordingly, we cannot conclude the trial court was manifestly erroneous in finding that Nola Bourbon established its right to a servitude for the placement of the Air-Conditioning Unit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED**